(168 App. Div. 261)

CROTON FALLS CONST. CO. v. CITY OF NEW YORK. (No. 7408.)

(Supreme Court, Appellate Division, First Department. June 18, 1915.)

1. MUNICIPAL CORPORATIONS ☞360—CONTRACTS—STIPULATIONS—POWER OF CHIEF ENGINEER.

A stipulation in a contract for the construction of the Croton Falls reservoir, initiated under the original aqueduct commission, and after abolition thereof completed by the department of water supply, gas, and electricity of the city of New York, that to prevent disputes the engineer shall determine the amount, quality, acceptability, and fitness of the several kinds of work and materials which are to be paid for under the contract, and shall determine all questions as to the work and the construction thereof, and decide every question as to the fulfillment of the contract, and that his estimate and decision shall be final, and that he shall make necessary explanations as to the meaning of the specifications and give orders contemplated by the contract, gives the acting chief engineer, in the absence of the engineer, power to order the construction of particular work within a class specified in the contract, and determine the nature and kind of work so done, so as to enable the contractor to be paid at the price fixed for that class of work.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 892, 892½; Dec. Dig. ☞360.]

2. MUNICIPAL CORPORATIONS ☞374—CONSTRUCTION CONTRACTS—RECOVERY—QUESTION FOR JURY.

Whether a contractor for the construction of a reservoir for a city's waterworks system was entitled to recover for certain work at a compensation fixed for class A specified by the contract, by reason of the action of the acting chief engineer, *held*, under the evidence, for the jury.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 905, 910; Dec. Dig. ☞374.]

3. MUNICIPAL CORPORATIONS ☞358—BUILDING CONTRACTS—POWER OF ENGINEER—ADMISSIBILITY.

A final certificate and determination of an engineer in charge of construction work are not binding on the contractor, where the engineer interprets the contract and has erred in the interpretation of the law applicable thereto, and a letter by the engineer disclosing his interpretation of the contract is admissible on the issue of the right of the contractor to recover compensation.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 890; Dec. Dig. ☞358.]

4. MUNICIPAL CORPORATIONS ☞374—CONTRACTS—EXTENT OF COMPENSATION.

Whether a contractor for the construction of a reservoir for a city waterworks system was entitled to recover compensation for certain work within class B of the contract, specifying the price therefor, instead of at a less rate for another class of work, *held*, under the evidence, for the jury.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 905, 910; Dec. Dig. ☞374.]

5. MUNICIPAL CORPORATIONS ☞374—CONSTRUCTION CONTRACTS—STIPULATIONS.

Whether a building contractor, under a contract providing that dimension stones should be measured for payment as of the sizes of the smallest rectangular blocks from which the separate stones could be cut, was entitled to an allowance of a specified number of inches on all sides of stones, *held*, under the evidence, for the jury.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 905, 910; Dec. Dig. ☞374.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from Trial Term, New York County.

Action by the Croton Falls Construction Company against the City of New York. From a judgment granting partial relief, plaintiff appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Albert B. Boardman, of New York City, for appellant.
William E. C. Mayer, of New York City, for respondent.

DOWLING, J.   This action was brought to recover the sum of $422,325.80, the amount claimed to be due under a contract for the construction of the Croton Falls reservoir. Plaintiff has recovered judgment in the sum of $35,388.95, and appeals from so much thereof as fails to give him the amount of certain claims, aggregating $270,968.86, with interest. The judgment was entered by direction of the court, which dismissed the additional claims referred to, and refused to submit the issues involved in such claims to the jury. The Croton Falls reservoir, which is one of the largest in New York City's Croton water system, was initiated under the original aqueduct commission, and after the abolition thereof was completed by the department of water supply, gas, and electricity of the city of New York, in which the powers of the former commission were vested by chapter 220, Laws of 1910. The contract was one for a unit price, as distinguished from a lump sum. The questions in controversy arise over the action of the city's engineer in claiming that certain units of the work should not be paid for at all, and that certain other units should be paid for at a less price per unit than that claimed by the contractor. The final estimate of the city's engineer fixes the aggregate contract price at $4,319,156.99. Plaintiff's contention is that the correct amount is $4,590,125.85. Of the amount shown by the final estimate, $31,697.29 had been withheld by the comptroller of the city of New York, and it is that amount, with interest, for which the plaintiff has recovered judgment, and from which judgment the city does not appeal. The balance, being the amount now in controversy, is made up of eight items. We shall state briefly the salient facts as to such of these claims as we think require our consideration:

[1-3] (1) Plaintiff claims that it placed class A monolithic concrete around the reinforcing rods in the main dam, above elevation 280.8, under due order from the engineer, and that it should have been allowed and paid therefor at the contract price of $7 per cubic yard (the price for class A concrete), instead of the amount finally allowed by the engineer, $2.65 per cubic yard (the contract price for cyclopean masonry). The difference in the contract price, based upon these two units, is $58,043.79.

The method of construction of the portion of the dam in question is as follows: Its faces are made of concrete blocks so placed in courses as to overlap or bond, and in every second course parts of the blocks extend inside the face and towards the center of the dam, being called "headers," and forming a bond between the face and the interior mass.

Every third block in every second course is a "header," and the face blocks not used as headers are called "stretchers." Inside of these block faces the dam consists, for the greater part, of cyclopean stone masonry. This masonry is composed of very large quarry block of irregular sizes and shapes, weighing up to six tons, the requirement being that they "shall be sound, clean, strong, and durable, and as large as can be economically quarried, transported, and handled." This construction was to be used under the specifications for substantially the whole of the main part of the dam, except the faces. The method of laying these stones is specified in detail under section 85 of the contract, under which the faces of the dam were to be built somewhat in advance of the interior. Wet concrete was to be deposited in sufficient quantities in low places in the work, and before it had attained its initial set large stones were to be lowered into it as close together as possible. The stones were then to be joggled with a bar, so as to settle them well into the concrete, and the concrete was to be worked with suitable tools, so as to force the escape of entrained air or water, and insure the filling with concrete and mortar of all spaces between and beneath the large stones. If smaller stones could be imbedded between the large stones, and between those stones and the face of the dam, this was to be done; the object being to obtain a monolithic mass of stone and concrete, with as large a proportion of stone as it was possible to secure, and a wall as nearly impervious to water as it was possible to make it. Up to level 280.8, the entire space was built up in this manner with cyclopean stones. So close were they placed to the facing blocks that in some cases they were only two inches apart, while the average distance was six inches. One of the essential features of the construction was to insure bonding or overlapping of the large stones.

In the winter of 1908–1909, Mr. Cook, the acting chief engineer, stated to the contractor that bad cracks had developed in the cross river dam, and that the engineers were considering reinforcing the dam in question to prevent a similar recurrence. To do this it was decided to place two rows of rods inside the facing blocks above elevation 280.8, in the placing of which great care was required to be used by the engineer to lay the bars level and to insure a continuous straight line. The ends of the rods were forged into hooks, which were interlocked to form a continuous, taut, and level line along the entire length of the dam. Wedges were driven where necessary to keep this line taut, as it had to be perfect in alignment. When the rods were placed, they were surrounded with concrete. Before this reinforcing had begun the contractor claimed that it was physically impossible to place the bars in cyclopean masonry, and that the plan must be modified before the work reached the elevation in question, where the reinforcing was to begin; otherwise, the contractor would positively stop work. It claimed, as one reason for the inability to place reinforcing in cyclopean masonry, the irregularity of the large stones, projecting at different angles and at different heights, and the variation of shapes of the stones, which made the maintenance of perfect alignment through such construction impossible. The engineer, Cook,

changed the classification and furnished a drawing showing what is described as "Limit for Classification" at a distance of one foot from the headers. The contractor claimed that the distance from the header at which the classification as class A concrete should cease, and that of cyclopean masonry begin, should be three feet; but the engineer said he would not classify beyond one foot, which was, he testifies, simply "to be the classification line between those two masonries or classes of masonry that was being mooted," and, as he further says, "That is what led up to the establishment of that line." The controversy about this line lasted several days, and it sufficiently appears that the contractor was unwilling to proceed beyond the point in question and do any reinforcing until the exact nature of the classification of the part of the work in which the rods were to be inserted had been determined, so that his compensation might be fixed at the proper unit price.

There is a question as to whether Cook made a final classification, or only a tentative one. Plaintiff's witnesses swear positively that the classification was a final and definite one, in reliance upon which they proceeded with their work. The engineer says that the words "limit for classification" upon the plan would indicate to the engineer that there were two classes of material to go in the dam other than the facing block, but would not indicate the kind of material that was to go in there. On cross-examination he testified that he said he "would not consider anything beyond a foot back of the headers, and that should be a classification pending future adjudication of whether they should be paid for the entire top of the dam, and whether this foot, or for none at all." But it also appears, even from his cross-examination, that the contractor had announced its intention of stopping work unless the classification was made, and that the one foot finally indicated was a compromise between the three feet claimed by the contractor and the engineer's disinclination to make any allowance at all. The contractor proceeded with the work, and it was properly performed; no large stones, such as are characteristic of cyclopean masonry, being used within the one-foot limit, but the rods being placed in a trench between the cyclopean stones and the back of the facing blocks, made level, and small stones being placed under the rods where necessary to effect such a level, the hooked ends being interlocked and forming a continuous, taut, and level line, wedges being used to accomplish that where necessary. The concrete was then filled in around, under, and over the bars, completely covering them to the depth of about a foot in this fresh concrete, small stones being placed therein by hand, and then more concrete being filled in to the next level, where more rods were to be laid. No heavy stones were used in this work, and care was required to maintain the tautness of the line of rods. The use of stones in class A concrete, within the direction of the engineer, was contemplated and provided for by the specifications, so that the presence of the stones therein did not destroy its character under the contract. As the work progressed (to all appearances satisfactorily), Cook, the acting chief engineer in charge, passed and approved the monthly estimates for July, September, and October, 1909, including allowances, as certified, in the first month named for 890 cubic yards

of this .work as class A monolithic concrete, in the second month 6,863 cubic yards of the same unit, and in the third month 12,185 cubic yards of the same unit, thereby confirming, apparently, the contention of the contractor that the classification had been finally made, and certainly showing that at that time, in the contemplation of the parties, it was more than a mere tentative classification. But with the return of Mr. Sears, the chief engineer, Cook advised him what he had done. As he says himself in direct examination:

"I told him that in putting in the steel rods the spaces had largely been filed up with concrete, due to the fact that large stones could not be introduced in those contracted spaces."

Sears, who was not in good health, and whom it annoyed to hear an extended argument, ended the matter by saying that he had ruled at the cross river dam that cyclopean masonry must be reinforced, and that it would be a reversal of his prior ruling to allow it in the case of this dam, and therefore he compelled the deduction from the estimates for November of an amount equal to the allowance which had been made for the difference in the classification of this work from July to October, inclusive. The October estimate had been approved by Sears himself, as well as by Cook. Before the contractor was aware of the changed position of the chief engineer, he had completed the work in controversy, and so had no intimation of the change of ground of the city until the work had been done. In a letter to the aqueduct commissioners, dated December 27, 1909, Sears quoted a letter of his to Cook, dated December 14, 1909, in which he had requested a revision of the classification as to the point in controversy, and stands upon the proposition that section 96 of the contract contemplates the extensive use of steel for reinforcing the main dam, and that, as no provision was made for the reclassification of any part of the masonry of the main dam on account of reinforcing the same with steel, in his opinion the whole mass should be classified as cyclopean masonry. Cook, in answer to the letter to him from Sears, said that he had estimated the masonry for one foot back from the tails of the headers as reinforced concrete; it being practically impossible to place cyclopean masonry as described in the specifications nearer than this limit to the blocks.

While it is perfectly true that the contract provides (section 96) that "portions of the concrete and other masonry shall, wherever shown on the contract drawings, and in other places, if required, be reinforced by imbedding in them twisted square steel rods, or other pieces of steel or iron of the number, shapes, and sizes directed," it sufficiently appears that the insertion of the rods in question, adjusted and tautened as required to be done, was impossible of performance through the mass of cyclopean masonry from the very nature of that form of construction, and that it would only safely be imbedded in a mass of concrete, as it was actually carried out. And the contract defines class A concrete monolithic masonry (section 71) as "all concrete reinforced with steel rods not otherwise classified," and, after enumerating certain portions of the work at which it is to be used, further provides that it shall be used "at such other places as the engineer may direct." Under

the contract the engineer was given extensive powers, and by articles 3 and 4 thereof it was provided:

"Art. 3. To prevent disputes and litigations, the engineer shall in all cases determine the amount, quality, acceptability, and fitness of the several kinds of work and materials which are to be paid for under this contract, shall determine all questions in relation to said work and the construction thereof, and shall in all cases decide every question which may arise relative to the fulfillment of this contract on the part of the contractor. His estimate and decision shall be final and conclusive upon said contractor, and in case any question shall arise between the parties hereto, touching this contract, such estimate and decision shall be a condition precedent to the right of the contractor to receive any money under this contract.

"Art. 4. The engineer shall make all necessary explanations as to the meaning and intention of the specifications, shall give all orders and directions contemplated therein or thereby, and in every case where a difficult or unforeseen condition shall arise in the performance of the work required by this contract. Any differences or conflicts which may arise between the contractor and other contractors of the commissioners in regard to their work shall be adjusted and determined by the engineer."

It seems plain, therefore, that Cook as acting chief engineer, with full authority in the absence of Sears, had power under the clauses heretofore quoted to order the placing of class A masonry in the space up to the one-foot line, and as well to determine the nature and kind of the work thus done, so as to enable the contractor to be paid at the unit price fixed for such work. Cook concededly had been designated by the resolution of the aqueduct board as acting chief engineer during the absence of Sears, and was division engineer as well. Under the contract, the quantities of the different classes of work specified were approximate only, being given as a basis for a uniform comparison of bids, and the commissioners did not, expressly or by implication, agree that the actual amount of work would correspond therewith, but reserved the right to increase or decrease the quantity of any class or portion of the work, as might be deemed necessary by the engineer. (See contract, under heading "Statement of Quantities.")

Upon these facts, and the others appearing in the record in detail, it would seem that questions of fact as to this first item were presented for the jury, and that plaintiff should have been allowed to go to the jury thereupon. It specifically asked to be allowed so to do upon the question of whether it had "placed monolithic concrete, class A, in any part of the main dam that was reinforced by the steel rods, namely, the part above elevation 280.8, and below the roadway, and inside the facing blocks, and outside a line one foot within the headers indicated by section 508 as limit for classification"; also as to whether the engineer had directed the contractor to put in class A concrete in the places described; also whether or not the action of the engineer in disallowing the allowance which had been made from July to October, inclusive, was arbitrary, and whether the mistake on his part in so doing was a palpable mistake. Not only were these questions for the jury, but there was an equally important question as to whether the classification made by Cook was a final one, upon the faith of which the contractor acted in proceeding with and completing the work which he was ordered to do, or whether it was simply a tentative and temporary arrangement, awaiting further adjustment.

Furthermore, the learned trial court held that the engineer's final estimate was controlling, that having been made by I. M. De Varona, chief engineer of the department of water supply, gas, and electricity of the city of New York. Plaintiff offered in evidence a letter from him to the commissioner of that department in which he discussed at length the various claims advanced by the contractor, including those involved in this appeal, and gave his reasons for disallowing the same. He set forth the history of the controversy as to the particular item now under consideration, and, after an admission that the contractor might have been entitled in equity to an additional compensation beyond the price stated for cyclopean masonry as to the section in question, added:

"The question under this claim is, in my opinion, purely a legal and not an engineering one, depending upon the legal interpretation of the contract clauses above referred to, and the authority vested in Mr. Cook, as acting chief engineer, to change the classification of the masonry by the method adopted, and the validity of his ruling."

This letter was excluded by the trial court after having been marked for identification. It would seem the offer came within the rule laid down in Uvalde Contracting Co. v. City of New York, 160 App. Div. 284, 145 N. Y. Supp. 604, that the final certificate and determination of the engineer are not binding upon the contractor where the engineer has attempted to interpret the contract and has erred upon an interpretation of the law applicable thereto. This letter should therefore have been received in evidence. It follows that the plaintiff's claim under this first item, and the issues suggested regarding it, should have been submitted to the jury for determination.

[4] (2) Plaintiff claims that, having placed class B concrete around the drainage channel at the top of the main dam under due order by the engineer, it should have been allowed and paid therefor at the contract price of $5.50 per cubic yard (being the unit price for such concrete), instead of at the rate of $2.65 (the contract price of cyclopean masonry). The difference for the 988 cubic yards of construction, amounts to $2,815.80. Class B is monolithic concrete, not reinforced with steel bars. Such concrete was placed at each side of the drainage tunnel at the top of the main dam. The drainage tunnel was a modification of the original plan, not having been intended or provided for, but becoming necessary because of the determination reached during the progress of the work to run a highway across the top of the dam, thus necessitating a drainage system to prevent the pollution of the reservoir. Plans for this channel were prepared. The original contract drawings carried the cyclopean masonry in the interior of the dam as high as the concrete facing at the top surface. To carry out the new plan, forms were required to be used, and it was impossible to lay cyclopean masonry in the narrow spaces left between the drainage tunnel and surrounding construction. Reinforcing steel was present in this section, adding to the impracticability of the use of the cyclopean masonry. No other class of construction than monolithic concrete class B could be used in this space, according to the statement of Cook, who gave orders for its use.

The question is similar in many respects to that discussed under the first point. Cook, as acting chief engineer, had allowed the contractor the higher unit price, and the same was included and certified in the estimates for September and October, 1909. It is testified that he gave the specific instructions that the sides of the tunnel should be built of monolithic concrete, class B, which the contractor complied with. Sears, the chief engineer, upon his return, had approved (as has been stated) the estimates for October, already approved by Cook as division engineer, and included in them was a recognition and certification of this work as class B concrete. The determination of Sears not to allow this, and his instructions to debit an amount equal to the allowance theretofore made upon this item, was based upon his contention, as in the case of the first item, that the contract forbade the use of anything save cyclopean masonry for the interior of the main dam. De Varona, in his letter to the commissioner, heretofore referred to, upon the subject of this claim, recognized that the contractor might have an equitable right for a small additional compensation because of the greater difficulty in laying cyclopean masonry under the given conditions, but held that the action of the engineer in changing the classification was unwarranted. He did so upon the ground that:

"I am inclined to question the authority of Acting Chief Engineer Cook to change the classification provided for in the contract, by the method he adopted, and have some doubt as to the validity of his ruling."

Section 71 of the contract provides that class B monolithic concrete shall be used at certain specified places and "at any other places that the engineer may direct." This question is interwoven with the question presented in the first item, and therefore further discussion of it seems unnecessary; the conclusion reached being the same—that questions of fact were presented for the jury, indicated by plaintiff's attorney in his motion to go thereto, as follows: Whether the plaintiff placed monolithic concrete, class B, in that part of the main dam, between the drainage tunnel and an imaginary line one foot within the headers, as indicated upon the plan, by the direction of the engineer; whether the action of the engineer in disallowing the allowance that had been made in the estimates for July to November was arbitrary; and whether the mistake upon his part in so doing was a palpable mistake. The letter heretofore referred to from the chief engineer was, of course, relevant as well upon this point as showing that he had disallowed the claim solely as a matter of legal construction by him of the contract.

[5] (3) The contract provides that dimension stones shall be measured for payment as of the "sizes of the smallest rectangular blocks from which the separate stones can be cut." Section 89. The city's chief engineer, Wegmann, in authority at the time when the stones in question (laid on the top of the waste weirs) were furnished, decided upon an allowance of three inches on all sides of the stone as reasonable. This allowance was reversed by De Varona, as chief engineer of the department of water supply, gas, and electricity, who made the basis of his computation the volume of a rectangular stone of the neat dimensions of the block to be used. The amount in controversy is

592.85 cubic yards, being the excess under the method established by Wegmann over that established by De Varona, and amounting to $27,-106.75. It appears that the stone used on the top of the waste weirs, known as dimension stone, and forming an edge over which the waste or overflow passes, is irregular in shape. The specifications required (section 89) that:

"The stones shall be cut to exact dimensions, and all angles and arrises shall be true, well-defined, and sharp."

It sufficiently appears that in practice it is necessary to take a block substantially larger than the dimension stone in its final form and cut it down to the exact dimensions. It was apparent, as soon as work was about to commence on these dimension stones, that an allowance would have to be made for cutting, as it was physically impossible to cut the dimension stone from a rectangular block without some allowance for cutting away. Therefore, acting under the provisions of article 3 of the contract, the plaintiff submitted the question of such allowance for waste or loss to the chief engineer; plaintiff contending that it was entitled to six inches on all sides of the stone. After consideration, the chief engineer, on May 14, 1910, wrote the plaintiff as follows:

"Referring to my conversation of yesterday with your Mr. J. F. Cogan, I would say that I have instructed division engineer Cook, in making up his monthly estimates, to make an allowance of three inches around the net dimensions of dimension stone."

In conformity with the practice thus indicated, the volume of the dimension stones was measured, and the allowance of three inches around each direction was included in the monthly estimates of March, April, and May, 1910. No question was raised as to the propriety of this allowance until Mr. De Varona succeeded to the control of the work. Thereafter, under his instructions, the allowance theretofore made was reduced so as to meet his views, with the consequent claim upon plaintiff's part. An expert quarryman and stonecutter was called, whose company had furnished the dimension stones in question, and whose testimony (by stipulation) was to the effect that:

The "sizes of the smallest rectangular blocks from which the separate dimension stone could in practice be cut are at least three inches on all sides larger than the rectangular blocks which were taken by the engineers as the standard of measurement; that is, six inches longer, six inches higher and six inches wider. The measurements taken by the engineers was 7.485 feet in width, 2.818 feet in height, by the net length of the stone."

The defendant called a witness, also an expert, who testified that:

"The smallest rectangular block from which any given stone can be cut is the size of the block which would be contained by the dimensions—the finished dimensions—of the given stone."

Thus, an issue of fact was presented as to what was the smallest rectangular block from which these dimension stones could be cut. This was quite apart from the question of the effect to be given to the allowance by the then chief engineer of the three-inch limit as a reasonable one. Plaintiff specifically asked to be allowed to go to the

jury on the question whether or not the sizes of the smallest rectangular stones from which the separate dimension stones could in practice be cut are at least three inches on all sides larger than the rectangular blocks which were taken by the engineers as the standard of measurement. The denial of this motion, to which exception was taken, was erroneous.

The other items of the plaintiff's claim which were dismissed, we think, were properly disposed of by the court, and do not require further discussion.

The judgment appealed from, in so far as it dismisses the three items of the plaintiff's claim heretofore enumerated, will therefore be reversed, and a new trial ordered as to the same, with costs to the appellant to abide the event. Settle order on notice. All concur.